RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0231p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

> No. 19-3395

JOSEPH HARVEY WARD, III,

*Defendant-Appellee.*

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:18-cr-00183-1—Algenon L. Marbley, District Judge.

Argued: January 31, 2020

Decided and Filed: July 27, 2020

Before: MERRITT, CLAY, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Kimberly Robinson, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellant. Steven S. Nolder, SCOTT & NOLDER CO. LPA, Columbus, Ohio, for Appellee. **ON BRIEF:** Kimberly Robinson, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellant. Steven S. Nolder, SCOTT & NOLDER CO. LPA, Columbus, Ohio, for Appellee.

MERRITT, J., delivered the opinion of the court in which CLAY, J., joined. GRIFFIN, J. (pp. 10–18), delivered a separate dissenting opinion.

_____

**OPINION**

_____

MERRITT, Circuit Judge.    The government appeals the district court's grant of Defendant Joseph H. Ward, III's motion to suppress under the Fourth Amendment of the United States Constitution.[1]  The government argues that the district court erred in failing to apply the good faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897 (1984).  We conclude that the government failed to establish a sufficient nexus between Ward's drug-dealing and his home.  We therefore **AFFIRM** the district court.

## I.  Facts and Procedural History

According to an affidavit filed in support of the search warrant at issue in this case, local law enforcement found Anthony Moore dead in his Westerville, Franklin County, Ohio, apartment on November 2, 2017.  Moore had a syringe in one hand, and his cell phone was located next to him.  Officers seized the cellphone and obtained a search warrant for its contents. The cellphone revealed text messages between Moore and "Joe".  Moore texted Joe, "Can u stop by? 20 and 20."  Joe agreed and requested Moore's address, which Moore provided.  Moore indicated that he wanted "Hard-Boy", and the attesting officer indicated that, through his training and experience, he knew that to mean crack-cocaine and heroin.  The text messages showed that Joe then arrived at Moore's address.

On November 8, 2017, officers obtained a court order to identify "Joe" through his cellular telephone number under the Stored Communications Act, 18 U.S.C. § 2703(d).  The cellphone data indicated "Joe" was Joe H. Ward, III, residing at 2133 Kilbourne Avenue, Columbus, Ohio.  Sometime thereafter, the Franklin County Coroner's Office reported that the

---

[1]The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

manner and cause of Moore's death "resulted from a mixture of cocaine and fentanyl toxicity," which the affiant indicated was consistent with the drugs purchased from Ward.

The affidavit states that six months after Moore was found dead, on May 1, 2018, officers searched Ward's trash located on the curbside of his residence. The affidavit indicates that, prior to this date, officers were unable to conduct a trash pull because the trash was not put on the curbside prior to Ward leaving in the morning. In any event, in the May 1 trash pull, officers found mail addressed to Ward, as well as "loose marihuana, cigar wrappers, and a plastic bag that appeared to contain illicit drugs at one time." On the same day, officers observed "two unidentified white males" at the residence. "One of the males had been sleeping inside his vehicle in the driveway, and the other male exited the residence through the garage door shortly after Ward left at 0650 hours."

In addition, the affidavit provides that Ward "has an extensive criminal history which includes charges of felony drug possession, trafficking in drugs, and weapons violations which include discharging a weapon into a habitat and having weapons while under disability."

Based on the above information, on May 2, 2018, the magistrate issued a warrant to search Ward's residence. [*Id.* at 97] Officers executed the warrant on May 7, 2018.

During the search, officers seized approximately a kilogram of heroin, some cocaine and some hashish, along with five firearms. Additionally, officers seized various types of ammunition, drug packaging material, a partial bag of syringes, a digital scale, facemasks, and a box of sandwich bags.

On August 30, 2018, a federal grand jury indicted Ward on one count of possession with intent to distribute heroin; one count of possession with intent to distribute cocaine; one count of possession with intent to distribute hashish; and one count of possession of a firearm in furtherance of a drug-trafficking crime.

On November 19, 2018, Ward filed a motion to suppress. Ward moved to suppress the evidence from his residence on grounds including, among other things, that the warrant was not

supported by probable cause and that the good faith exception to the exclusionary rule did not apply.

On January 10, 2019, the district court held a hearing on Ward's motion and issued an opinion on March 29, 2019. The district court granted in part and denied in part Ward's motion to suppress, holding in part that the warrant to search Ward's residence was not supported by probable cause but not explicitly discussing whether the good faith exception applied despite this lack of probable cause. This appeal followed.

## II. Application of Law to Facts

The government does not argue that the warrant was supported by probable cause. We therefore assume, without deciding, that the affidavit does not establish probable cause. The single issue before us, then, is whether the search of Ward's home can be saved by the good faith exception to the exclusionary rule. We hold that it cannot.

This Court reviews de novo whether the good faith exception to the exclusionary rule applies. *See United States v. McCoy*, 905 F.3d 409, 415 (6th Cir. 2018).

A probable cause determination requires the magistrate issuing the warrant to decide, based on the affidavit, if "there is a fair probability that contraband or evidence of a crime will be in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Reviewing courts must "ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238–39 (alterations in original) (quoting *Jones v. United States*, 326 U.S. 257, 271 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980)). "When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987).

The Supreme Court in *United States v. Leon*, however, created the so-called "good faith" exception to the exclusionary rule for evidence seized in "reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." 468 U.S. at 905. In deciding if the good faith exception applies, courts ask "whether a reasonably well trained officer would have

known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23. The *Leon* court provided four situations in which the good faith exception does not apply. *Id.* at 923. We address here the third situation: whether the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11 (1975) (Powell, J., concurring in part)).

An affidavit "so lacking in indicia of probable cause" is known as a "bare bones" affidavit. *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017). To elude the "bare bones" label, the affidavit must state more than "suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge" and make "*some* connection" between the illegal activity and the place to be searched. *United States v. Christian*, 925 F.3d 305, 312–13 (6th Cir. 2019) (en banc) (quotations and citations omitted). We read the affidavit holistically and examine the totality of the circumstances in making this inquiry. *White*, 874 F.3d at 502.

The affidavit here states the following: (1) police discovered undated text messages indicating that Ward sold Moore heroin and crack-cocaine at Moore's residence sometime before Moore's death, which was discovered on November 2, 2017; (2) on the morning of May 1, 2018, police found in Ward's trash an unidentified quantity of "loose marihuana, cigar wrappers," and a plastic bag containing residue of an unidentified, purportedly illicit substance, and saw two unidentified males around Ward's home; and (3) Ward was previously charged with drug and weapons offenses. In its brief, the government states that Ward's criminal history included drug and weapon convictions, but the affidavit clearly states that Ward was only charged with such offenses. We recognize that we do not review affidavits for technical deficiencies, but the fact that the affidavit mentions only charges is a factor we consider. The government does not discuss in its brief the two males observed around Ward's residence, and it did not do so at oral argument. While we consider all of the information in the affidavit, we are not inclined to give those particular facts much weight.

The cases on which the government rely illustrate why the good faith exception does not apply here. At oral argument, the government contended that *White*, and our unpublished opinion in *United States v. Harris*, 6 F. App'x 304 (6th Cir. 2001), provide the most guidance.

In *White*, an informant told police that the defendant was selling drugs from his home and, within the same month, the police substantiated the tip with a controlled buy in the defendant's driveway.  874 F.3d at 494.  The defendant also had numerous drug convictions.  *Id.* at 498.  Here, we have neither a tip alleging that Ward sold drugs from his home, a controlled buy at Ward's residence, evidence of numerous drug convictions, nor the prompt action by law enforcement.  *White* therefore does not persuade us to apply the good faith exception here.

In *Harris*, the affidavit detailed an approximately nine-month investigation that began with an informant telling police in early 1998 that Harris was the supplier for two local cocaine dealers.  6 F. App'x at 306.  Officers conducted three controlled buys in April 1998, and, although the controlled buys did not occur at Harris's home, Harris supplied the informant's dealer for each controlled buy.  *Id.*  Officers connected the vehicle Harris used to transport drugs to each transaction to his residence and then conducted three searches of Harris's trash at two different houses within a five-month period.  *Id.*  The first search occurred in April, the same month as the first controlled buy, and the last in August, just before the warrant was issued.  *Id.*  Each trash pull uncovered drug-related evidence.  *Id.*

More recently, we applied the good faith exception in *United States v. Gilbert*, 952 F.3d 759 (6th Cir. 2020).  There, the investigation began after the attesting officer witnessed Gilbert participate in a drug transaction on August 29, 2016.  *Id.* at 761.  A few weeks later, the officer found a "'large quantity of cash' in Gilbert's vehicle following a traffic stop."  *Id.*  The officer connected Gilbert to two different homes, and the officer "surveilled Gilbert's homes many times."  *Id.*  In addition, the officer "conducted three trash pulls over several months" between the two houses.  *Id.*  Two of the trash pulls, one in February 2017 and another in June 2017, found evidence such as "chrome scale weights" and vacuumed sealed bags, which the affiant "knew drug dealers often used to conceal the scent of marijuana."  *Id.*  The defendant also had a "lengthy criminal history, including 2006 convictions for drug-trafficking, drug possession, and possessing a weapon while under disability."  *Id.*

The facts that bring *Harris* and *Gilbert* within the good faith exception are absent here. The controlled buys and trash pulls in those cases showed that the defendants continuously dealt drugs and used their residences for this purpose for several months leading up to the execution of

the warrant.    Although the trash searches in *Gilbert* began five months after the initial transaction, the police substantiated the first trash pull with another trash pull a few months later, which, as in *Harris*, allowed the inference that further drug-related evidence would be found in the defendant's home.    The affidavit in *Gilbert* also noted that the defendant had a "lengthy criminal history" which included eleven-year-old convictions for drugs and weapons offenses.

The affidavit here provides that Ward received drugs and weapons *charges* but does not indicate when those offenses occurred or if they ever resulted in convictions.    Undated charges, without further information, are not probative of whether Ward used his residence to traffic drugs at the time officers effected the search.    Moreover, the lone trash pull here, six months after Moore's death, does not compare to the three trash pulls in *Harris* and *Gilbert*.    As for the unidentified males around Ward's home, the affidavit does not indicate any suspicious activity by them, and the government does not rely on those facts in its brief, nor did it do so at oral argument.    Perhaps it would be different if law enforcement here conducted the trash pull earlier, or if they searched Ward's trash more than once.    But those are not the facts before us.

The most recent case where we applied the good faith exception is *United States v. Govea*, -- F. App'x --, 2020 WL 1491302 (6th Cir. 2020), which is also materially distinguishable from this case.    In *Govea*, police had been investigating the sale of methamphetamine by someone other than the defendant.    *Id.* at *1.    A confidential informant, who had bought methamphetamine from the target "over a hundred times during the year prior to the warrant application," told law enforcement that Govea was with the target during most of those times.    *Id.*    During the month prior to the warrant application, the informant engaged in three controlled buys with the target, and Govea was present during all three transactions.    *Id.*    Within 48 hours of the warrant application, a detective observed the target and Govea leave the suspect's home and travel to Govea's residence, where Govea "went inside for a few minutes and then exited."    *Id.*    Govea then drove the target to complete a monitored transaction.    *Id.*    We do not have here evidence indicative of Ward using his residence for drug-trafficking or evidence that Ward "had longstanding ties to an ongoing drug-trafficking operation."    *See id.* at *2.

While we have applied the good faith exception on the inference that a drug dealer likely keeps drugs at his home, those cases involved evidence of larger scale, continual and ongoing drug operations. *See United States v. Ardd*, 911 F.3d 348, 351 (6th Cir. 2018); *McCoy*, 905 F.3d at 417 ("Evidence of a defendant's ongoing course of unlawful conduct may make it reasonable to conclude that he keeps evidence of his illegal scheme in his home."). In *Ardd*, the defendant's house was searched following his arrest for purchasing a large quantity of cocaine from an undercover officer. 911 F.3d at 350. The defendant had previously repeatedly told the officer that "he wanted distribution quantities of cocaine and that he was ready to buy over 250 grams of cocaine" from the officer. *Id.* at 352. And in *McCoy*, the defendant's house was also searched only after he was arrested in possession of large amounts of marijuana and cash, and a confidential informant relayed that the defendant and others sold marijuana from two stores, that the defendant and others involved in the drug distribution lived together, and that the informant saw guns and marijuana at their residence. *McCoy*, 905 F.3d at 413–14 ("The police officer's warrant application established enough of a basis to believe that at least one of the defendants was engaged in a continual, ongoing drug-trafficking operation and that therefore drug-related contraband was likely to be found in his home."). The affidavit here does not provide evidence of the volume or continuity found in those cases.

*United States v. Hython*, 443 F.3d 480 (6th Cir. 2006), is an example of where we did not apply the good faith exception, and supports our conclusion here. In *Hython*, the affidavit stated that a reliable informant told officers that a drug dealer in a nearby city supplied his local crack-cocaine dealer, and officers followed the informant's dealer to the defendant's residence where the defendant sold the informant's dealer crack cocaine. *Id.* at 482–83. The controlled buy was not dated in the affidavit. *Id.* at 483. The court did not apply the good faith exception because the affidavit did not indicate a timeframe for the events, and, more importantly here, the isolated controlled buy did not allow an inference that further drug-related evidence would be found in the defendant's home, as the sale of drugs is not "inherently ongoing." *Id.* at 485. This case is most similar to *Hython*, and the government's case was stronger there than it is here. If the tip indicating that the defendant sold drugs and the controlled buy at the defendant's residence did not bring *Hython* within the good faith exception, it follows that the good faith exception does not apply here, either.

### III. Conclusion

The affidavit in this case thus failed to provide the minimally sufficient nexus between drug-trafficking and Ward's residence.  We therefore **AFFIRM** the district court.

---

**DISSENT**

---

GRIFFIN, Circuit Judge, dissenting.

After a months-long investigation into the drug-induced death of Anthony Moore, law enforcement officers sought a warrant from a neutral and detached magistrate to search the home of defendant Joseph Ward. From the facts in the affidavit, the magistrate determined that there was probable cause to believe that evidence of drug trafficking would be found in Ward's home and therefore authorized a search warrant. Inside the home, officers found more than a kilogram of heroin, some cocaine and hashish, and five firearms.

The magistrate may have erred by authorizing the warrant because the information contained in the supporting affidavit did not give rise to probable cause. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). However, in my view, the affidavit contained enough factual support bearing on probable cause that a reasonably well trained officer "would not know to disregard a judicial determination that probable cause existed." *United States v. Gilbert*, 952 F.3d 759, 760 (6th Cir. 2020). Thus, the good-faith exception applies, and the district court erred in granting Ward's motion to suppress. For this reason, I respectfully dissent.

I.

On November 2, 2017, Anthony Moore was found dead in his apartment with a syringe in his hand and his phone next to his body. Police determined that Moore's cause of death was a drug overdose, and the ensuing investigation revealed the following facts: (1) Moore negotiated the purchase of crack cocaine and heroin from someone identified in his cell phone as "Joe" before his death; (2) law enforcement obtained a court order for cell-site location information for "Joe's" phone and traced it to 2133 Kilbourne Avenue, an address in Columbus, Ohio belonging to defendant Joseph Ward; (3) law enforcement identified Ward coming and going from the residence at 2133 Kilbourne Avenue; (4) Ward had an "extensive criminal history" including "charges" for felony drug possession, trafficking in drugs, and weapons violations; and (5) a trash pull conducted on May 1, 2018 at 2133 Kilbourne Avenue revealed mail addressed to Joe

Ward, "loose marijuana," and other drug paraphernalia including cigar wrappers and a plastic bag which "appeared to have contained illicit drugs at one time."

Thereafter, the investigating officers did exactly what they were supposed to do. One day after finding drugs and drug paraphernalia in defendant's trash, Detective David Leighty drafted an affidavit detailing the facts of the investigation and applied for a search warrant for Ward's 2133 Kilbourne Avenue residence with the Franklin County Municipal Court. The state-court judge found that probable cause existed to believe that evidence of Ward's alleged drug trafficking would be found at 2133 Kilbourne Avenue and issued the search warrant. Five days later, officers searched Ward's home pursuant to the warrant and seized more than a kilogram of heroin, approximately eight grams of cocaine, more than 200 grams of hashish (concentrated marijuana resin), two rifles, three handguns, ammunition, and various tools of the drug trafficking trade.

A federal grand jury in the Southern District of Ohio eventually charged Ward with possession with intent to distribute heroin, cocaine, and hashish and possession of a firearm in furtherance of those crimes. Defendant moved to suppress the evidence, arguing among other things, that the search warrant was obtained without a showing of probable cause and that the good-faith exception did not apply. The district court agreed that the search warrant affidavit did not establish probable cause and granted defendant's motion to suppress. However, in doing so, the court failed to address the government's alternative argument that the good-faith exception applied. This interlocutory appeal followed.

II.

In *United States v. Leon*, the Supreme Court established an exception to the exclusionary rule for evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." 468 U.S. 897, 905 (1984). In a break from the previously reflexive and uncompromising approach of excluding all evidence seized without probable cause, the Supreme Court established a new objective inquiry limiting suppression to circumstances in which the benefits of police deterrence outweigh the heavy costs of excluding "inherently trustworthy tangible evidence" from the jury's consideration. *Id*. at 907.

"Following *Leon*, courts presented with a motion to suppress claiming a lack of probable cause must ask whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (internal quotation marks and citation omitted). "Only when the answer is 'yes' is suppression appropriate." *Id.* To aid courts in resolving this question, *Leon* outlined four circumstances in which an officer's reliance would *not* be objectively reasonable. 468 U.S. at 914–15.

The only one of the four scenarios at issue here is the "bare bones" affidavit. "We reserve that label for an affidavit that merely states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019) (en banc) (internal quotation marks and citation omitted). In other words, the affidavit must be "'so lacking in indicia of probable cause' as to make an officer's 'belief in its existence [ ] objectively unreasonable.'" *Id.* (alteration in original) (quoting *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005)).

In essence, a bare-bones affidavit is a conclusory affidavit—one that asserts "only the affiant's belief that probable cause existed." *United States v. Williams*, 224 F.3d 530, 533 (6th Cir. 2000) (citation omitted). It provides nothing more than a mere "guess that contraband or evidence of a crime would be found," *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994), either "completely devoid" of facts to support the affiant's judgment that probable cause exists, *United States v. Carpenter*, 360 F.3d 591, 595–96 (6th Cir. 2004) (en banc), or "so vague as to be conclusory or meaningless," *United States v. Frazier*, 423 F.3d 526, 536 (6th Cir. 2005) (quoting *Carpenter*, 360 F.3d at 596).

By contrast, an affidavit is not bare bones if, although falling short of establishing probable cause standard, it contains "a minimally sufficient nexus between the illegal activity and the place to be searched." *Carpenter*, 360 F.3d at 596. If the reviewing court is "able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been"—"some modicum of evidence, however slight"—"between the criminal activity at issue

and the place to be searched," then the affidavit is not bare bones and official reliance on it is reasonable. *Laughton*, 409 F.3d at 749–50.

Accordingly, an affidavit is not "bare bones" simply because it lacks the requisite facts and reasonable inferences to sustain the magistrate's probable-cause finding; rather, it must be "*so* lacking in indicia of probable cause that, despite a judicial officer having issued a warrant, *no* reasonable officer would rely on it." *White*, 874 F.3d at 497. This is more than a matter of semantics. "There must be daylight between the 'bare-bones' and 'substantial basis' standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function." *Id.* Only when law enforcement officials operate in "'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights" will the "heavy toll" of suppression "pay its way." *Davis v. United States*, 564 U.S. 229, 237–38 (2011) (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009), and *Leon*, 468 U.S. at 908 n.6). Otherwise, "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful," excluding evidence recovered as a result of a technically deficient affidavit serves no useful purpose under the exclusionary rule. *Id.* at 238 (quoting *Leon*, 468 U.S. at 909). Thus, the defects in an affidavit must be apparent to the eyes of a reasonable officer before we fault him for complying with his duty to execute a court-issued order. *Leon*, 468 U.S. at 921 ("[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law." (quoting *Stone v. Powell*, 428 U.S. 465, 498 (1976) (Burger, C.J., concurring))).

Our most recent precedential authority on bare bones affidavits is dispositive. In *United States v. Gilbert*, we held that a search warrant affidavit was not bare bones where the officer applying for the search warrant, Detective Yasenchack, attested to the following facts:

> (1) he had witnessed Gilbert participate in a drug transaction on August 29, 2016, which had led to the conviction of [another individual]; (2) he found "a large quantity of cash" in Gilbert's vehicle following a traffic stop; (3) Gilbert had a lengthy criminal history including 2006 convictions for drug trafficking and drug possession; (4) Yasenchack surveilled Gilbert's homes many times; (5) at one point, Yasenchack had attempted to tail Gilbert's vehicle but broke off surveillance once Gilbert began driving in circles which was "a tactic drug dealers often use to determine if they are being followed"; (6) he had conducted three trash pulls over several months; and (7) the day prior to the search warrant

> application, he discovered "suspected marijuana crumbs" in Gilbert's trash within a large vacuum sealed bag, which he knew drug dealers often used to conceal the scent of marijuana.

952 F.3d at 761. In particular, we held that the "minimal nexus between the place to be searched and the evidence sought" was established based on Yasenchack's observation of the defendant engaging in a suspected drug transaction in public, his determination that the defendant had a history of trafficking controlled substances, and his discovery of "fresh evidence" of marijuana crumbs in the defendant's trash at his residence. *Id.* at 764.

The present case is controlled by and indistinguishable from *Gilbert*. Like that case, we have a triggering event which, alone, would not establish a nexus between drug trafficking and the place to be searched—here, that is Anthony Moore's overdose and the subsequent discovery of the texts linking the drugs to "Joe," and the cell-site location data which linked "Joe's" phone to Joseph Ward's residence. By itself, this information could not satisfy the good-faith exception. *See, e.g.*, *United States v. Brown*, 828 F.3d 375, 385–86 (6th Cir. 2016) ("Save for a passing reference to Brown's car registration, the affidavit is devoid of facts connecting the residence to the alleged drug dealing activity."); *United States v. Hython*, 443 F.3d 480, 486 (6th Cir. 2006) ("[A] well-trained officer could not reasonably rely on the affidavit, given that it was based on one undated, acontextual controlled buy.").

However, the affidavit in *Gilbert* and the one at issue also established that the suspect had an "extensive" or "lengthy" criminal history, and that "fresh evidence" of marijuana was discovered in the trash of the home to be searched. *Gilbert* holds that attesting to these facts in a search warrant affidavit creates a sufficient nexus to connect the alleged criminal activity to the place to be searched. 952 F.3d at 764. Thus, the present affidavit and the *Gilbert* affidavit fall within the good-faith exception.

## III.

The majority opinion views this case differently. But what is striking about the opinion is that before discussing a single case involving an actual bare bones affidavit, it first attempts to distinguish *six* cases which hold that an affidavit was *not* bare bones. No matter how thinly the majority opinion slices those prior holdings to avoid binding precedent, it cannot escape the

conclusion that the good-faith exception applies. Instead, this hyper-factual discussion largely serves to distract from the proper inquiry of whether the search warrant affidavit was "*so* lacking in indicia of probable cause that, despite a judicial officer having issued a warrant, no reasonable officer would rely on it." *White*, 874 F.3d at 497.

The majority opinion offers three reasons why *Gilbert* is not controlling. First, it states that the evidence there suggested that the defendant "continuously dealt drugs and used [his] residence[] for th[at] purpose for several months leading up to the execution of the warrant." Second, it claims that *Gilbert* is distinguishable because the attesting officer described that Gilbert had a "lengthy criminal history" including *convictions* for drug and weapon offenses, whereas the affidavit here provided that Ward had an "extensive criminal history" including *charges* for felony drug possession, drug trafficking, and weapons violations. Finally, the majority opinion views this case differently than *Gilbert* because there, the officers conducted *three* trash pulls, rather than just the one. The opinion states that "perhaps it would be different" if the officers in the instant case had "conducted the trash pull earlier, or if they searched Ward's trash more than once." In my view, none of these distinctions are material. If the affidavit in *Gilbert* was "sufficiently meaty" to avoid the bare-bones label, then the same conclusion applies here, notwithstanding the minor factual differences emphasized by the majority opinion. 952 F.3d at 764.

The same is true of the other cases cited by the majority. It makes no difference that the affidavit here "does not provide evidence of the volume or continuity" of drug activity when compared to *United States v. Ardd*, 911 F.3d 348 (6th Cir. 2018), and *United States v. McCo*y, 905 F.3d 409 (6th Cir. 2018), which the majority suggests as the sole basis to distinguish these additional cases applying the good-faith exception. Once we are splitting hairs about the extent, volume, or continuity of drug activity at a defendant's residence, it's obvious that the good-faith exception must apply because, by definition, the affidavit has established "the minimally sufficient nexus" between the drug activity and the place to be searched. *See Ardd*, 911 F.3d at 351–352 (collecting cases that applied the good-faith exception to affidavits that established a minimal connection between the defendant's drug dealing and the place to be searched); *see also*

*Christian*, 925 F.3d at 313 ("Although one can split hairs with the affidavit in this case, it is impossible to deny that it contains factual allegations, not just suspicions or conclusions.").

The majority opinion cites only a single case (*Hython*) where the good-faith exception did not apply, and even then, the discussion is confined to a single paragraph. In *Hython*, the search warrant affidavit detailed how, on an unknown date, officers arranged for a confidential informant to purchase crack cocaine, and then tailed the drug dealer to an address on South Fifth Street in Steubenville, Ohio, where she remained for only two minutes, before re-emerging and returning to the confidential informant with crack cocaine. 443 F.3d at 482–83. The attesting officer presented no additional facts, and then concluded that "[D]ue to the above transaction with the residence, officers believe the[re] to be further crack cocaine within the [Steubenville] residence." *Id.* at 483. In reversing the denial of defendant's motion to suppress, the *Hython* court observed that:

> The South Fifth Street transaction is not dated, and the affidavit contains no indication of ongoing investigation, subsequent or previous controlled buys, or further surveillance of the address or the female supplier. Any of these things might serve to establish that the house was the site of an ongoing criminal enterprise, or ground the undated controlled buy within a finite period of investigation. However, without any of these elements, the affidavit is patently insufficient. No well-trained officer could have reasonably relied on a warrant issued on the basis of this affidavit.

*Id.* at 488–89.

Here, the majority opinion's analysis of *Hython* is limited to its conclusory statement that "[i]f the tip indicating that the defendant sold drugs and the controlled buy at the defendant's residence did not bring *Hython* within the good faith exception, it follows that the good faith exception does not apply here, either." But that's a world away from the facts of our case. *See Christian*, 925 F.3d at 313 ("This case is like *Hython* only if . . . one completely ignores most of the affidavit by discounting each item one by one."). *Hython* might be relevant to the present case if the police had applied for a search warrant of Ward's home based solely on the electronic data which led them to the residence. That is not what happened. Rather than immediately apply for a warrant, the officers researched Ward's criminal history, surveilled his residence, pulled his trash, and discovered marijuana and drug paraphernalia before applying for a search

warrant.  Even if the investigation fell short of probable cause, the majority opinion offers no explanation for why the officers should not be entitled to rely on the magistrate's probable cause determination.

Finally, consider the additional examples of bare bones affidavits that *Gilbert* catalogued:

The prototypical examples of *Leon*'s bare bones affidavit come from *Nathanson v. United States*, 290 U.S. 41, 54 (1933), and *Aguilar v. Texas*, 378 U.S. 108 (1964).  *See Leon*, 468 U.S. at 915.  In *Nathanson*, the affiant stated under oath that "he has cause to suspect and does believe that" liquor illegally brought into the United States "is now deposited and contained within the premises" belonging to the defendant. 290 U.S. at 44.  In *Aguilar*, the affiants stated "in relevant part" that they "received reliable information from a credible person and do believe that heroin, marijuana, barbiturates and other narcotics and narcotic paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law."  378 U.S. at 109.  And in more contemporary times, we have held that a search warrant affidavit was bare bones when:

• "[s]ave for a passing reference to [defendant's] car registration, the affidavit [wa]s devoid of facts connecting the residence to the alleged drug dealing activity," *Brown*, 828 F.3d 375, 385 (6th Cir. 2016);

• "the only connection" between the places to be searched and the alleged crime (murder), was "hearsay information that [the defendant] was the last person to be seen with [the victim]," *United States v. West*, 520 F.3d 604, 611 (6th Cir. 2008).

952 F.3d at 764–65 (alteration in original and parallel citations omitted).  In contrast to *Nathanson* and *Aguilar*, Leighty's affidavit contained more than his unsupported conclusion that a crime had occurred, or that unspecified information led him to believe that drugs would be found in Ward's home.  And unlike *Brown* or *West*, Leighty's affidavit established an identifiable nexus between Ward's home and his suspected drug activity.

For all of these reasons, this case falls into the "heartland of the *Leon* exception." *Christian*, 925 F.3d at 312.  Unfortunately, by "[r]efusing to adhere" to our precedential authority, the majority opinion does exactly what *Christian* prohibits; it "unduly exalt[s] the Fourth Amendment interest marginally served by deterring nonculpable conduct over the public interest in combatting crime." *Id.* at 313.

IV.

I respectfully dissent because the majority opinion fails to follow our binding precedent, which compels the conclusion that the good-faith exception applies.  I would reverse the district court's suppression order.