**[Cite as *State v. Battles*, 2021-Ohio-3005.]**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 19AP-641 |
| v. | : | (C.P.C. No. 18CR-2757) |
| Carolyn Battles, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |
| State of Ohio, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 19AP-653 |
| v. | : | (C.P.C. No. 18CR-2756) |
| Kenneth Slaughter, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on August 31, 2021

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Daniel J. Stanley*, for appellant. **Argued:** *Seth L. Gilbert.*

**On brief:** *Carpenter Lipps & Leland LLP*, and *Kort Gatterdam*, for appellee Carolyn Battles.

**On brief:** *Yeura Venters*, Public Defender, and *Robert D. Essex*, for appellee Kenneth Slaughter. **Argued:** *Robert D. Essex.*

APPEALS from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} In these coordinated appeals, plaintiff-appellant, State of Ohio ("the state"), appeals a judgment of the Franklin County Court of Common Pleas granting the motion to suppress filed by defendants-appellees, Kenneth Slaughter and Carolyn Battles.[1] For the following reasons, we reverse that judgment and remand this case to the trial court for further proceedings.

{¶ 2} This case began on March 26, 2018 when a confidential informant ("CI") arranged for Detective Sherard Pollard of the Franklin County Sheriff's Office Special Investigations Unit ("SIU") to purchase one-half ounce of cocaine for $600 from Battles, who was known to the CI as "Cece." Battles utilized a cell phone to coordinate the drug deal with Pollard and the CI.

{¶ 3} At 12:33 p.m., Pollard picked up the CI at a Goodwill store located at 2550 N. High Street and drove to a United Dairy Farmers ("UDF") store located at 8480 N. High Street. Upon arrival, the CI called Battles. Shortly thereafter, a white Ford Edge bearing New York registration number HSJ-9737 pulled into the parking lot and parked on the north side of the UDF. Pollard and the CI exited their vehicle and entered the back seat of the white Ford Edge. A white female, later identified as Susan Sena, was in the driver's seat; Battles was in the front passenger seat. Pollard exchanged greetings with Battles and asked if he could see the cocaine. Battles responded that she wanted Pollard to first show her the money. Pollard produced $600 in prerecorded funds and placed the money on the center console. Battles handed Pollard a plastic baggie containing suspected cocaine. Pollard and the CI exited the white Ford Edge; Pollard then returned the CI to the Goodwill store.

{¶ 4} On an unspecified date (presumably subsequent to the above-noted transaction), Pollard drove to a Taco Bell store located at 2553 N. High Street to meet the CI. The CI informed him that Sena would be traveling to the Taco Bell on foot. At approximately 1:30 p.m., Sena arrived and got in the back of Pollard's vehicle. From her jacket pocket, Sena produced a plastic baggie containing suspected cocaine and handed it to Pollard. In exchange for the cocaine, Pollard gave Sena $1,200 in prerecorded funds. Sena then exited Pollard's vehicle and proceeded on foot toward High Street. SIU detectives

---

[1] By journal entry issued December 13, 2020, this court granted the state's motion to coordinate the appeals.

conducting surveillance of Sena observed her enter a residence located at 59 W. Blake Avenue.

{¶ 5} On an unspecified date (presumably sometime after March 26) at approximately 11:09 p.m., two SIU detectives began surveilling a residence located at 8577 Clover Glade in Lewis Center, Ohio ("Clover Glade"). On an unspecified date at 11:14 a.m., a tan Acura MDX bearing Ohio registration number HCJ-9373 pulled into the driveway and parked. At 11:15 a.m., an unknown black male wearing a gray sweat suit and red hat exited the passenger side of the Acura and entered Clover Glade through the front door; an unknown black female remained seated in the driver's seat. At 11:18 a.m., three adults, including Battles and the black male who had been in the Acura, exited Clover Glade accompanied by three juveniles. At 11:20 a.m., the black male entered the passenger side of the Acura; two of the juveniles got in the back seat. At 11:25 a.m., Battles, along with an unknown black female and a juvenile, entered the same white Ford Edge involved in the March 26 transaction. Both vehicles then left Clover Glade.

{¶ 6} On April 10, 2018, a CI arranged for Pollard to purchase from Battles two ounces of cocaine for $2,200. Battles utilized the same cell phone to coordinate the transaction as that used on March 26. On an unspecified date (presumably April 10, 2018) at approximately 3:50 p.m., Pollard picked up the CI from a Tim Horton's store located at 8333 N. High Street and drove to the same UDF store that was the site of the March 26 transaction. The CI called the number provided by Battles; a person identifying himself as Ray answered the call. The CI informed Ray of their arrival. The same white Ford Edge involved in the March 26 drug deal entered the parking lot and parked on the north side of the UDF. Pollard and the CI exited their vehicle and entered the back seat of the white Ford Edge. As in the March 26 transaction, Sena was in the driver's seat and Battles was in the front passenger seat. Battles displayed a plastic baggie containing suspected cocaine. Pollard provided Battles with $2,200 in prerecorded funds. Battles gave the plastic baggie containing the cocaine to Pollard. Pollard and the CI then exited the white Ford Edge. Surveilling SIU detectives followed the white Ford Edge to Clover Glade and observed Sena and Battles go inside.

{¶ 7} On April 13, 2018, Pollard sought a warrant to search Clover Glade. The basis for the warrant was a four-page affidavit in which Pollard relayed the facts stated above.

Pollard further stated that he "has good cause to believe and does believe * * * that evidence of * * * Drug Trafficking * * * [is] being kept in 8577 Clover Glade * * * known to be the residence of [Battles] and Kenneth Slaughter." He added that during his 17-year law enforcement career, he received O.P.O.T.A. certification, attended numerous training conferences and seminars, and participated in several narcotics investigations.  (State's Ex. A, Search Warrant Aff. at 1.)

{¶ 8}    Based solely on the information contained in the affidavit, a Delaware County Municipal Court judge issued a search warrant for Clover Glade. The warrant described the residence and its "primary residents" as Kenneth Slaughter and [Battles]." (State's Ex. A, Warrant to Search at 1.)   The warrant authorized the search for, inter alia, controlled substances and packaging materials, firearms, documents and records related to drug trafficking, cellular phones, indicia of occupancy, residency and/or ownership of the premises or vehicles located on the premises, and currency.

{¶ 9}    On June 8, 2018, a Franklin County Grand Jury returned a six-count indictment against Slaughter, Battles, and Sena,[2] charging them with violations of various drug trafficking and firearm and forfeiture-related specifications.  The indictment alleged that the offenses occurred on March 26, April 5, April 10, and April 17, 2018.  On July 26, 2019, Slaughter moved to suppress all evidence obtained in the search, arguing that the search warrant was invalid because the supporting affidavit failed to establish probable cause.

{¶ 10}   The trial court held a hearing on the motion to suppress on August 20 and 21, 2019.  With Slaughter's consent, and without objection from the state, Battles joined in the motion.   The parties set forth arguments in support of their respective positions; no evidence was adduced.  At the conclusion of the hearing, the trial court determined that the search warrant was invalid because the affidavit supporting it failed to establish probable cause.  Specifically, the court found that the facts alleged in the affidavit did not create a sufficient nexus between the alleged criminal activity and Clover Glade.  The trial court further determined that the affidavit so lacked indicia of probable cause that no objectively reasonable police officer could in good faith rely on the warrant.

---

[2] The charges against Sena were dismissed on April 11, 2019 pursuant to her death.

{¶ 11} On September 5, 2019, the state filed a post-hearing memorandum contra. In it, the state set forth several facts not included in the search warrant affidavit as well as facts pertaining to execution of the warrant, including a description of the evidence seized from Clover Glade. The state requested that the trial court reconsider its determination that an objectively reasonable police officer could not in good faith rely on the warrant. The state further urged that in analyzing the good-faith exception, the trial court could look beyond the four corners of the affidavit to evidence known by the investigators but not presented to the judge who issued the warrant.

{¶ 12} On September 12, 2019, the court held a hearing on the matters raised in the state's memorandum contra. The state requested that the court permit Pollard to testify as to facts known to him but not included in his search warrant affidavit. The trial court denied that request; however, the court permitted Pollard to proffer sworn testimony outside the court's presence.

{¶ 13} To that end, Pollard testified that he had been in the SIU for only one year at the time he prepared the search warrant affidavit and that it was the first affidavit he had ever drafted. He further averred that in addition to the facts set forth in the affidavit, he was aware of the following additional information:

> [C]ellular data pinging back to [the Clover Glade address], moving surveillance from deal one, which was in March. We had surveillance units following that Ford Edge after the deal going back to Glover Glade.
>
> After that deal, we placed a GPS tracker on that vehicle and had surveillance units at that house observing Ms. Battles and an unknown white female we later identified as Susan Sena exiting that house and entering back in with a key.

(Sept. 12, 2019 Suppression Hearing Tr. at 112.)

{¶ 14} Pollard further testified that the surveillance of Clover Glade referenced in the search warrant affidavit resulted from the above noted facts.

{¶ 15} When questioned by the state as to how the "second deal in the affidavit * * * relate[s] to Clover Glade," Pollard responded: "If you look at the GPS data, it shows that that vehicle leaves from Clover Glade and goes over to Blake. Prior to the deal, it shows that the vehicle leaves Clover Glade, goes to Blake and then Susan Sena comes out to do the narcotics transaction on foot and goes back to Blake Avenue." *Id.* at 113. Pollard concurred

in the state's assertion that the "second deal" was relevant to Clover Glade because the affidavit indicated that the "second deal was at an undisclosed location, Sena walked there and walked back. The GPS data shows how the car went from Glover Glade to Sena's place." *Id.*

{¶ 16} Regarding the relevance of the "third deal" to Clover Glade, Pollard averred, "we had visual surveillance on the Clover Glade address prior to the deal. Once the call was placed to set up * * * the meet location, moving surveillance established surveillance on the house, the front door, and observed Ms. Battles and Susan Sena exit that house, enter the vehicle and come directly to me. The deal was conducted and done as moving surveillance followed Ms. Battles and Susan Sena back to that residence." *Id.* at 113-14.

{¶ 17} Finally, Pollard testified that the "ping order" on the cell phone he called to set up the third drug deal demonstrated that the "vehicle and the phone were at the same location," i.e., Clover Glade. *Id.* at 114-15.

{¶ 18} On September 18, 2019, the trial court issued an entry reiterating its findings that the search warrant affidavit failed to establish probable cause to search Clover Glade and so lacked indicia of probable cause that no objectively reasonable police officer could in good faith rely on the warrant. Thus, the court granted the motion to suppress and ordered exclusion of all evidence seized under the warrant.

{¶ 19} The state timely appeals, advancing three assignments of error for review:

> [I]. The trial court erred in granting defendant's motion to suppress evidence when the four corners of the affidavit provided the issuing magistrate a substantial basis for granting the warrant.
>
> [II]. The trial court erred when it suppressed the evidence without making any finding as to whether there was a culpable violation of the Fourth Amendment.
>
> [III]. The trial court erred in not considering evidence known to the investigation but not presented to the issuing judge in its good-faith analysis.

{¶ 20} We consider the state's first and second assignments of error together. These assignments of error essentially contend that the search warrant affidavit established probable cause to search Clover Glade, and, alternatively, that even if the affidavit did not establish probable cause, the police executed the warrant in good faith. On these grounds,

the state maintains that the trial court erred when it granted the defendants' motion to suppress evidence obtained pursuant to the warrant.

{¶ 21} "The review of a motion to suppress is a mixed question of law and fact." *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, ¶ 32, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. "The very nature of the questions presented requires a case-by-case fact-driven analysis." *Id.*, citing *State v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426, ¶ 14. "Moreover, when a reviewing court determines that a warrant should not have been issued, it must then determine whether the good-faith exception applies, and that question is a question of law, subject to de novo review by the appellate court." *Id.*, citing *United States v. Leary*, 846 F.2d 592, 606 (10th Cir.1988).

{¶ 22} The Fourth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or other things to be seized." Article I, Section 14 of the Ohio Constitution similarly provides that "[t]he right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched and the person and things to be seized." *See also* R.C. 2933.22(A); Crim.R. 41(C).

{¶ 23} The state first contends that the search warrant affidavit established probable cause to search Clover Glade. Ordinarily, "[w]hen determining whether a search warrant affidavit demonstrates probable cause, a magistrate must ' "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." ' " *State v. Neil*, 10th Dist. No. 14AP-981, 2016-Ohio-4762, ¶ 34, quoting *State v. George*, 45 Ohio St.3d 325 (1989), paragraph one of the syllabus, quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).

> In reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by a

magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a *de novo* determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant. Rather, the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant.

*George* at paragraph two of the syllabus.

{¶ 24} "Probable cause means less evidence than would justify condemnation, so that only the 'probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' " *State v. Eal*, 10th Dist. No. 11AP-460, 2012-Ohio-1373, ¶ 10, quoting *George* at 329; *State v. Allen*, 10th Dist. No. 08AP-264, 2008-Ohio-6916, ¶ 28 (the probable cause determination only depends on the fair probability of criminal activity, not a prima facie demonstration of criminal activity). "[W]hen no oral testimony is presented to the neutral and detached magistrate in conjunction with an affidavit for a search warrant, the probable-cause determination is based on the four corners of the document." *Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, at ¶ 106; *State v. Saxton*, 10th Dist. No. 18AP-925, 2019-Ohio-5257, ¶ 21 (in general, the issuing judge or magistrate is confined to the averments contained in the supporting affidavit to determine whether probable cause supports a search warrant).

{¶ 25} "Special considerations to be taken into account when determining whether to issue a search warrant include how stale the information relied upon is, when the facts relied upon occurred, and whether there is a nexus between the alleged crime, the objects to be seized, and the place to be searched." *Castagnola* at ¶ 34, citing 2 LaFave, *Search and Seizure,* Section 3.7(a), (b), and (d). Further, "[w]hen considering whether a nexus exists between the alleged crime and the place to be searched, ' "the circumstances must indicate why evidence of illegal activity will be found in a particular place." ' " *State v. Phillips*, 10th Dist. No. 15AP-1038, 2016-Ohio-5944, ¶ 14, quoting *United States v. Washington*, 380 F.3d 236, 240 (6th Cir.2004), quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir.2004).

{¶ 26} Here, the search warrant affidavit indicates that on March 26, 2018, a CI arranged a $600 controlled drug buy between Pollard and Battles. The transaction occurred inside a white Ford Edge. Sometime after that transaction, police surveilling Clover Glade observed Battles exit the residence and enter the same white Ford Edge involved in the March 26 transaction. The affidavit further states that on April 10, 2018, a CI arranged a $2,200 controlled drug buy between Pollard and Battles; that transaction also occurred inside the white Ford Edge. Officers observed the white Ford Edge drive to Clover Glade immediately following completion of the April 10 transaction.

{¶ 27} The state points out that Battles conducted two of the three controlled buys mentioned in the affidavit inside the white Ford Edge and was observed exiting Clover Glade and entering that same vehicle between those two events. The state further notes that Battles and Sena drove immediately to Clover Glade after conducting the $2,200 transaction. The state argues that these facts provided the issuing judge with a substantial basis to conclude that a nexus existed between Clover Glade and the alleged criminal activity, and, particularly regarding the $2,200 transaction, probable cause to believe that the proceeds of that transaction would be found in the residence. In support, the state primarily relies on three cases from this court finding that temporal proximity between a controlled drug transaction and arrival at a residence provides an issuing authority a substantial basis to conclude that a nexus exists between the place to be searched and the alleged criminal activity and, at the least, probable cause to believe proceeds of a drug transaction would be located in the residence. *See Saxton*, 10th Dist. No. 18AP-925, 2019-Ohio-5257, at ¶ 24; *State v. Young*, 10th Dist. No. 18AP-845, 2019-Ohio-4639, at ¶ 19; *Phillips* at ¶ 26.

{¶ 28} The state further maintains that the three-day delay between the April 10 transaction and the April 13 issuance of the warrant did not render the information included in the affidavit stale and thus insufficient to support probable cause. " 'An affidavit in support of a search warrant must present timely information and include facts so closely related in time of issuing the warrant as to justify a finding of probable cause at that time.' " *Eal*, 10th Dist. No. 11AP-460, 2012-Ohio-1373, at ¶ 21, quoting *State v. Ingold*, 10th Dist. No. 07AP-648, 2008-Ohio-2303, ¶ 22. "The test for staleness is simply 'whether the alleged facts justify the conclusion that contraband is probably on the person or premises to be

searched at the time the warrant issues.' " *Id.*, quoting *Ingold.* "The factors to consider in determining whether the information in the affidavit is stale include the character of the crime, the criminal, the thing to be seized and in particular whether it is perishable, the place to be searched, and the nature of the incident as either isolated or ongoing criminal activity." *Id.*, citing *Ingold* at ¶ 23. The state maintains that because the April 10 transaction involved such a large sum, i.e., $2,200, the issuing judge could conclude that there was a fair probability that at least a portion of those proceeds would still be in the residence three days later, i.e., at the time the warrant was issued.

{¶ 29} We need not resolve the probable cause issue, however, because even if we were to determine that the search warrant affidavit did not furnish the issuing judge with a substantial basis for concluding that there was probable cause to search Clover Glade, we are inclined to uphold the search based upon the "good faith exception" to the exclusionary rule set forth in *United States v. Leon*, 468 U.S. 897 (1984), and adopted by the Supreme Court of Ohio in *State v. Wilmoth*, 22 Ohio St.3d 251 (1986). *See, e.g.*, *Allen,* 10th Dist. No. 08AP-264, 2008-Ohio-6916, at ¶ 33 ("we further conclude that, even if probable cause did not exist, the police executed the search warrant in good faith under *Leon*"); *Washington*, 380 F.3d 236 at 239 (upon finding that the good-faith exception to the exclusionary rule applied, the court assumed without deciding that probable cause did not exist).

{¶ 30} "When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *State v. Johnson*, 48 Ohio App.3d 256, 259 (4th Dist.1988), citing *Illinois v. Krull*, 480 U.S. 340, 347 (1987). However, under the good-faith exception, evidence obtained during a search conducted pursuant to a warrant that is unsupported by probable cause will not be excluded if the officers who obtained the evidence acted reasonably in relying on the warrant. *George*, 45 Ohio St.3d 325 at paragraph three of the syllabus, following *Leon* ("The Fourth Amendment exclusionary rule should not be applied so as to bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause.").

{¶ 31} The good-faith exception to the exclusionary rule is limited in its application. As noted in *George*, the *Leon* court cautioned that an officer's reliance on the magistrate or judge's probable cause determination "must be *objectively* reasonable." (Emphasis sic.) *George* at 331. Thus, "[s]uppression remains an appropriate remedy" in four specific circumstances: (1) the supporting affidavit contained information the affiant knew to be false or would have known to be false but for reckless disregard for the truth; (2) the issuing judge wholly abandoned his [or her] judicial role; (3) the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or (4) the warrant was so facially deficient in terms of particularity that the executing officers could not reasonably presume it to be valid. *Id.*, citing *Leon* at 923.

{¶ 32} In the present case, only the third *Leon* circumstance is at issue. Indeed, the trial court concluded that the warrant was based on an affidavit so lacking in indicia of probable cause that no objectively reasonable police officer could rely on it.

{¶ 33} Jurisprudence from the United States Court of Appeals for the Sixth Circuit is both instructive and persuasive on the "indicia of probable cause" issue. An affidavit lacks the requisite indicia of probable cause if it is a "bare bones" affidavit. *United States v. Ward*, 967 F.3d 550, 554 (6th Cir.2020), quoting *United States v. White*, 874 F.3d 490, 496 (6th Cir.2017). The inquiry into whether an affidavit is so bare bones as to preclude application of the good-faith exception is a less demanding inquiry than that involved in determining whether an affidavit provides a substantial basis for the judge's conclusion of probable cause. *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir.2005). "An affidavit cannot be labeled 'bare bones' simply because it lacks the requisite facts and inferences to sustain the magistrate's probable-cause finding; rather, it must be *so* lacking in indicia of probable cause that, despite a judicial officer having issued a warrant, *no* reasonable police officer would rely on it." (Emphasis sic.) *White* at 496, citing *United States v. Helton*, 314 F.3d 812, 824 (6th Cir.2003). "The distinction is not merely semantical. There must be daylight between the 'bare-bones' and 'substantial basis' standard if *Leon's* good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function." *Id.*, citing *Leon* at 906-07 and *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir.2004). "Only when law enforcement officials operate in ' "deliberate," "reckless," or "grossly negligent" disregard

for Fourth Amendment rights" will the "heavy toll" of suppression "pay its way." ' " (Further citations omitted.) *Id.*, quoting *Davis v. United States*, 564 U.S. 229, 237-38 (6th Cir.2011). "Otherwise, 'when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful,' excluding evidence recovered as a result of a technically deficient affidavit serves no useful purpose under the exclusionary rule." *Id.*, quoting *Davis* at 238, quoting *Leon* at 909, 919. "We must therefore find that the defects in an affidavit are apparent in the eyes of a reasonable [police officer] before faulting an executive official for complying with his or her duty to execute a court-issued order." *Id.*, citing *Leon* at 921.

{¶ 34} "To elude the 'bare bones' label, the affidavit must state more than 'suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge' and make '*some* connection' between the illegal activity and the place to be searched." (Emphasis sic.) *Ward* at 554, quoting *United States v. Christian*, 925 F.3d 305, 312-13 (6th Cir.2019). "If the reviewing court is 'able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been'—'some modicum of evidence, however, slight'—'between the criminal activity at issue and the place to be searched,' then the affidavit is not bare bones and official reliance on it is reasonable." (Emphasis sic.) *White* at 496, quoting *Laughton* at 749-50. "We read the affidavit holistically and examine the totality of the circumstances in making this inquiry." *Ward* at 554, citing *White* at 502 (a court must read the affidavit holistically, examining the totality of the circumstances and employing a heathy dose of common sense). "If an inference is obvious from the factual context, a reviewing court should indulge it." *White* at 502, citing *United States v. Greene*, 250 F.3d 471, 479 (6th Cir.2001).

{¶ 35} Under this legal framework, we conclude, after reading the affidavit holistically, examining the totality of the circumstances, and employing a healthy dose of common sense, that it is not a "bare bones" affidavit. The affidavit contains much more than simply "suspicions or conclusions." The affidavit includes sufficient factual content to establish "*some* connection" between suspected illegal activity, i.e., drug trafficking, and Clover Glade. In particular, the affidavit includes detailed facts about all three controlled drug buys, including the dates of the first and third transactions and Pollard's personal involvement in those transactions. The affidavit also states that the first and third controlled buys occurred inside the white Ford Edge, that the white Ford Edge was

observed at the Clover Glade residence between those two transactions, and that the white Ford Edge traveled to Clover Glade immediately following completion of the third controlled buy. Because the affidavit establishes "*some* connection" between the alleged criminal activity and the place to be searched, the search falls within the good-faith exception to the exclusionary rule set forth in *Leon* and should be upheld even if the warrant was lacking in probable cause. Consequently, we sustain the state's second assignment of error. Such disposition renders the first assignment of error moot.

{¶ 36} In its third assignment of error, the state contends that the trial court erred in its good-faith analysis by failing to consider the testimony proffered by Pollard regarding facts known to the investigation but not presented to the issuing judge.

{¶ 37} In *State v. Dibble*, 159 Ohio St.3d 322, 2020-Ohio-546, the Supreme Court of Ohio held that in deciding whether the good-faith exception to the exclusionary rule applies to a search conducted under a search warrant, a trial court can consider extrinsic evidence beyond the four corners of a search warrant affidavit in the form of sworn statements made by a police officer to the judge at the time the warrant was approved. *Id.* In the present case, because Pollard did not provide sworn testimony to the judge at the time the warrant was approved, the trial court limited its good-faith analysis to the four corners of the search warrant affidavit. *Dibble,* decided after the trial court granted the motion to suppress in this case, did not invalidate the trial court's four-corners analysis; rather, it essentially reinforced it. Thus, the trial court did not err in its good-faith analysis by failing to consider Pollard's proffered testimony. However, as we determined in the second assignment of error, the trial court's four-corners, good-faith analysis was erroneous. The third assignment of error is therefore moot.

{¶ 38} In conclusion, the state's second assignment of error is sustained, and the first and third assignments of error are moot. The judgment of the Franklin County Court of Common Pleas is reversed, and this matter is remanded to the trial court for further proceedings consistent with this decision.

*Judgment reversed; case remanded.*

BROWN and SADLER, JJ., concur.

_____